IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRUCE MANDRELL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:06-cv-612-JPG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Judge J. Phil Gilbert pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and SDIL-LR 72.1 (a) for a Report and Recommendation. Plaintiff Bruce Mandrell seeks judicial review of the final decision of the Commission of Social Security denying his claim for Social Security Disability Insurance and Supplemental Security Income. Plaintiff's applications were rejected by Administrative Law Judge George A. Mills III ("the ALJ") when he rendered a decision finding that Plaintiff was not disabled (Tr. 138-150). That decision became final when the Appeals Council declined to review the ALJ's findings (Tr. 6). Judicial Review of the Commissioner's final decisions is authorized by 42 U.S.C. § 405(g).

For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's petition be **DENIED**, that **JUDGMENT** be entered in favor of Defendant, and that the Court adopt the following findings of fact and conclusions of law:

### FINDINGS OF FACT

**Procedural History**

Plaintiff, Bruce Mandrell, filed for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") on June 23, 2003, alleging that he was unable to work due

to Reactive Airway Disease ("RAD")[1] and Restrictive Lung Disease[2] (Tr. 265-269, 289).  His claim was denied initially on August 11, 2003, and upon reconsideration on September 5, 2003 (Tr. 232-238).  Plaintiff requested and was granted a hearing before an administrative law judge on February 1, 2005.  On June 3, 2005, the ALJ issued a decision denying benefits after determining that Plaintiff was not disabled (Tr. 138-150).  On June 9, 2006, the Appeals Counsel denied Plaintiff's request for review (Tr. 6-8).  After this final decision, Plaintiff filed his complaint with this Court on August 8, 2006 (Doc. 2).

**Substantive History**

At the time of the ALJ's decision, Plaintiff was forty-four years old (Tr. 163).  At that time, Plaintiff's past relevant work included work as a retail cashier, construction worker, game room operator, dispatcher, and correctional officer (Tr. 167-177).

On November 9, 2001, while on duty as a correctional officer, Plaintiff inhaled a self defense chemical agent known as BodyGuard while attempting to subdue a prison inmate who had escaped from his cell (Tr. 259).  BodyGuard contains the chemical oleoresin capsicum and is designed to incapacitate the intended target of the spray (Tr. 259).  Immediately after his exposure, Plaintiff was incapacitated and had to be taken to the prison infirmary (Tr. 259).  Plaintiff went to a doctor the day after the incident because he was coughing and suffering breathing problems stemming from his exposure to BodyGuard (Tr. 259).

---

[1] Reactive Airways Disease, a synonym for Asthma, is a diagnosis usually used to describe people with a history of coughing, wheezing, dyspnea or sputum production and the need for an inhaler. John V. Fahey & Paul M. O'Byrne, *"Reactive Airways Disease"* A Lazy Term of Uncertain Meaning That Should Be Abandoned, 163 AM. J. RESPIR. CRIT. CARE MED. 822, (Mar. 2004), *available at* http://ajrccm.atsjournals.org/cgi/content/full/163/4/822.

[2] Restrictive lung disease is associated with either a loss of lung tissue, decrease in lung's ability to expand, or a decrease in either the lungs ability to transfer oxygen into the blood or carbon dioxide of the blood. Jan Nissl, Lung Function Tests, Web MD, July 11, 2004, http://www.webmd.com/asthma/guide/Lung-Function-Tests?.

On November 11, 2001, Dr. Roger Jones saw Plaintiff and prescribed him Advair[3] for a few days until the symptoms subsided (Tr. 337).  On December 14, 2001, Plaintiff visited Dr. Salem who subsequently referred him to a pulmonary specialist, Dr. Chirag Dave (Tr. 280).

Dr. Chirag Dave became Plaintiff's primary pulmonary specialist after Plaintiff first visited him on December 19, 2001 (Tr. 646).  As a result of this initial visit, Dr. Dave believed Plaintiff could have hypersensitivity pneumonitis,[4] chemical exposure pneumonitis,[5] hyperereosinophilic syndrome[6] secondary to allergies, or reactive airway disease (Tr. 646).  Since all of these conditions are treatable with prednisone,[7] Dr. Dave prescribed Plaintiff a high dose prednisone (Tr. 646).  On December 26, 2001, Dr. Dave performed a spirometry test[8] on Plaintiff, which indicated that he had a moderate restrictive lung problem (Tr. 513).  After this visit, Dr. Dave referred Plaintiff to Dr. Peter Tuteur and ordered a CAT scan [9] of his chest (Tr. 513-514).  Dr. Dave continued to treat Plaintiff and, in January of 2003, he performed another pulmonary

---

[3] Advair is a plastic oral inhaler device made by GlaxoSmithKline which disperses medication into the air stream of the patient.  Advair is a treatment for Asthma and Chronic Obstructive Pulmonary Disease Associated with Chronic Bronchitis. Physician's Desk Reference 1291-1294 (60th ed. 2006).

[4] "Hypersensitivity pneumonitis is an inflammation of the lungs caused by exposure to an allergen." Hypersensitivity pneumonitis, Web MD, Feb. 1, 2005, http://www.webmd.com/a-to-z-guides/hypersensitivity-pneumonitis.

[5] Chemical exposure pneumonitis is an inflammation of the lungs caused by inhalation of a material toxic to the lungs.  The Merck Manual 674 (Robert Berkow et al. eds., 15th ed. 1987).

[6] Hypereosinophilic syndrome is a condition "in which buildup of a type of white blood cell leads to scarring." Heart Failure Health Center, Web MD, Aug. 30 2006, http://www.webmd.com/heart-disease/Heart-Failure/tc/Restrictive-Cardiomyopathy-Topic-Overview.

[7] Prednisone is an oral medication used to reduce swelling and allergic type symptoms. Drugs and Treatment – Prednisone Oral, Web MD, http://www.webmd.com/drugs/mono-9383-PREDNISONE+-+ORAL.aspx?drugid=6007&drugname=Prednisone+Oral.

[8] A spirometry test measures the amount of air a person's lung can move in and out at a certain rate. Kerry V. Cooke, Spirometry Test, Web MD, May 27, 2005, http://www.webmd.com/hw-popup/Spirometry.

test which revealed some obstruction as well as very significant restriction in Plaintiff's lungs (Tr. 516).  To treat Plaintiff, Dr. Dave prescribed several medications, including inhalers, Combivent,[10] Serevent,[11] and a nebulizer machine[12] (Tr. 536).

Dr. Dave wrote two letters regarding Plaintiff's disability.  On March 07, 2003, Dr. Dave wrote a letter "To Whom It May Concern" describing Plaintiff as suffering from "reactive airway disease and bronchiolitis obliterans[13] since last year" and as having been "temporarily disabled because of his condition and short breath" (Tr. 625).  On September 9, 2004, Dr. Dave wrote a second letter to "To Whom It May Concern," stating, "At this time, he is deemed disabled to complete his work in a normal fashion because of his persistent shortness of breath." (Tr. 747).

Dr. Peter Tuteur examined Plaintiff on January 18, 2002 (Tr. 339).  During this visit, Plaintiff received a Pulmonary Function Test,[14] a Chest X-Ray, and a CT scan (Tr. 340).  Dr. Tuteur interpreted the pulmonary test as moderately restrictive, the chest x-ray as indicating no active disease or change from a prior chest x-ray in June of 1998, and the CT Scan as showing no active process of lung parenchyma[15] (Tr. 340).  Dr. Tuteur noted that the most likely diagnosis

---

[9] A CAT Scan is a computerized device used to give the physician internal images of the patients body. Jan Nissl, Computed Tomography (CT) Scan of the Body, Web MD, Nov. 15, 2005, http://www.webmd.com/a-to-z-guides/Computed-Tomography-CT-Scan-of-the-Body.

[10] Combivent is an inhalation Aerosol made by Boehringer Ingelheim.  It is used to treat chronic obstructive pulmonary disease. Supra note 3 at 878-879.

[11] Serevent is a plastic inhalation delivery system made by GlaxoSmithKline.  It is used to treat Asthma and Chronic Obstructive Pulmonary Disease. Supra note 3 at 1540-1542.

[12] A nebulizer is a machine that changes asthma medication for a liquid to a mist so that it can be inhaled into the lungs. Home Nebulizer Therapy, Web MD, http://www.webmd.com/asthma/guide/home-nebulizer-therapy.

[13] Bronchiolitis obliterans is a lung inflammatory disorder.  Bronchiolitis Obliterans Organizing Pneumonia, Web MD, http://www.webmd.com/a-to-z-guides/Bronchiolitis-Obliterans-Organizing-Pneumonia.

[14] A pulmonary function test is a general term for tests that evaluate how the patient's lungs are working. Nissl, supra note 2.

[15] Parenchyma means the key elements of an organ that are essential to its functioning. Definition of Parenchyma, MedicineNet, http://www.medterms.com/script/main/art.asp?articlekey=12708.

was chemically-induced bronchial reactivity (Tr. 340).  Dr. Tuteur also prescribed Serevent and Combivent, and recommended that Plaintiff control his environment and reduce exposure to antigens[16] (Tr. 340).  Dr. Tuteur also warned Plaintiff that returning to work in his previous capacity would be difficult and may pose a significant health risk (Tr. 340).

On July 9, 2003, Dr. Woodhall Stopford examined Plaintiff (Tr. 552-558).  During Dr. Stopford's examination, he had Plaintiff run in place for sixty seconds, which caused Plaintiff to cough, breathe heavily, and wheeze with forced expiration (Tr. 555).  After this test, Plaintiff's tachypnea[17] continued for between three and four minutes after Plaintiff stopped running (Tr. 555).  Dr. Stopford's assessment, as indicated in the report, determined that Plaintiff: (1) was exposed to pepper spray, (2) had reactive airways dysfunction with continued airway reactivity, secondary to the pepper spray, and (3) had long-term prednisone treatment with associated hypertension,[18] hypercholestolemia,[19] hyperglyceridemia,[20] and sleep apnea[21] (Tr. 556).  Dr.

---

[16] Antigens are "substances capable of combining with antibody and of eliciting immune responses, either humoral or cell-meditated." Supra note 5 at 263.

[17] Tachypnea is abnormally fast breathing. Definition of Tachypnea, MedicineNet, http://www.medterms.com/script/main/art.asp?articlekey=5702.

[18] Hypertension is the condition of elevated blood pressure. Supra note 5 at 390-403.

[19] Hypercholestolemia is condition where a patient's serum cholesterol level is above the 95th percentile for the population. Supra note 5 at 1003.

[20] Hyperglyceridemia is when there is an excess of glycerides in the blood. Dorland's Illustrated Medical Dictionary, Merck Source, 2004, http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzuszSzcommonzSzdorlandszSzdorlandzSzdmd_h_19zPzhtm.

[21] Sleep Apnea is "a potentially lethal disorder in which breathing stops during sleep for ten second or more, sometimes less than 300 times a night." Supra note 5 at 1379.

Stopford recommended reinstatement of Singulair,[22] or another leukotriene inhibitor,[23] and the addition of a mast cell membrane stabilizer[24] (Tr. 556).

On August 4, 2003, the Illinois Bureau of Disability Determination Services (DDS) evaluated Plaintiff's Residual Functional Capacity (Tr. 326).  The DDS concluded that the claimant is "capable of light work with environmental restriction" (Tr. 336).  The DDS recommended avoidance of concentrated exposure to "Fumes, odors, dusts, gases, poor ventilation, etc" (Tr. 333).

CONCLUSIONS OF LAW

**Legal Background**

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive. . . ."); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001); See also White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) ("the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility" (citation and quotation marks omitted).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales,

---

[22] Singulair is a medication used to treat Asthma and for the relief allergic rhinitis. Supra note 3 at 2050.

[23] Leukotriene inhibitor is a term for medications that reduce lung inflammation. Mary L Windle, Leukotriene Inhibitors, Web MD, http://www.webmd.com/allergies/guide/leukotriene-inhibitors.

[24] Mast cell membrane stabilizers prevent the release substances that cause inflammation. Merrill Hayden, Mast Cell Stabilizers for Long-Term Control of Asthma, Web MD, April 4, 2006, http://www.webmd.com/asthma/Mast-cell-stabilizers-for-long-term-control-of-asthma.

402 U.S. 389, 401 (1972) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101 (7th Cir.

1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence

and if there have been no errors of law. Golembiewski, 32 F. 3d at 915; Cannon v. Apfel, 213

F.3d 970, 974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support

or an adequate discussion of the issues." Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th

Cir. 2003).

　　　　Disability insurance benefits are available only to those individuals who can establish a

"disability" under the terms of the Social Security Act.  The claimant must show that he is unable

"to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A).

　　　　The Social Security regulations enumerate a five-step sequential evaluation to be followed

when determining whether a claimant has met the burden of establishing a disability. 20 C.F.R. §

416.920.  The ALJ must first consider whether the claimant is presently employed or "engaged in

substantial gainful activity." 20 C.F.R. § 416.920(b).  If he is, the claimant is not disabled and the

evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe

impairment or combination of impairments which "significantly limits. . . physical or mental

ability to do basic work activities." 20 C.F.R. § 416.920(c). If the claimant's impairment is not

severe, then the process is over, and the claimant is considered not disabled.  If the finding is

severe, however, the ALJ must proceed to step three.

At step three, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 416.920(d). If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. Id. However, if the impairment does not so limit the claimant's remaining capabilities, in step four the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. 20 C.F.R. § 416.920(e). If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. § 416.920(f). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner, at step five, to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g). If either Plaintiff is determined not capable to perform other work or such work does not exist in the national economy, the ALJ will enter a finding that Plaintiff is disabled.

**The ALJ's decision**

The ALJ first determined that Plaintiff satisfied the first two steps in determining whether he was disabled within the meaning of the Social Security Act. Specifically, the ALJ found that (1) Plaintiff had not engaged in a substantial gainful activity since the alleged onset of disability, and (2) Plaintiff's post arthroscopic right knee, prior partial and arthroscopic meniscectomy,[25] chemically-induced bronchial reactivity (mace induced-capsicum)[26] / reactive airways disease

---

[25] Menioscectomy is a surgery used to remove all or part of the torn meniscus. Kathe Gallagher, Menioscectomy for a Minor Meniscus Tear, Web MD, September 22, 2005, http://www.webmd.com/a-to-z-guides/Meniscectomy-for-a-meniscus-tear.

[26] Capsicum is an active compound containing casaicin which is an alkaloid that is irritating to skin and mucous membranes. Capsicum, The Free Dictionary Medical Dictionary, http://medical-dictionary.thefreedictionary.com/Capiscum, Capsaicin, The Free Dictionary Medical Dictionary, http://medical-dictionary.thefreedictionary.com/capsaicin.

(RADS), mild obstructive airway disease, and obesity were considered "severe" within the requirements of 20 C.F.R §§ 404.1520(c) and 416.920(c).

In considering the third step, the ALJ found that these impairments did not meet or medically equal a listed impairment in Appendix 1, Subpart P, Regulation No. 4.  At step four, the ALJ determined that Plaintiff was able to perform past relevant work.  The ALJ also considered step five, where he found that Plaintiff could perform a significant number of jobs in the national economy.[27]  After considering each of these steps, the ALJ determined that Plaintiff was not disabled.

**Plaintiff's Claims of Error**

Plaintiff argues five reasons why the ALJ's decision should be overturned.  Plaintiff asserts that the ALJ (1) improperly decided that Plaintiff's pulmonary listing did not equal a listing set forth the Appendix 1, Subpart P, Regulations; (2) erred in failing to confront and explain why he rejected the opinion of the Doctors who treated Plaintiff; (3) failed to properly evaluate Plaintiff's credibility; (4) failed to base his decision that Plaintiff could return to his past relevant work on substantial evidence; and (5) failed to meet the burden of establishing that there was work available to Plaintiff in the national economy.

**(1)     Plaintiff's Pulmonary Listing**

Plaintiff argues that the ALJ wrongly decided that Plaintiff's condition did not meet or equal a listing set forth in the Appendix 1, Subpart P, of the Regulations because the ALJ substituted his own medical judgment for that of Plaintiff's treating physicians.  Plaintiff contends

---

[27] Once an ALJ determines that a claimant can perform their past relevant work, the ALJ must enter a finding that the claimant is not disabled.  In this case, the ALJ also determined that there were a significant number of jobs available in the national economy, both as to Plaintiff's past relevant work and other jobs meeting his RFC. This finding went beyond what was required under 20 C.F.R. § 416.920.

that when discussing pulmonary listings 3.02 and 3.03, the ALJ focused only on the FVC[28] and FEV1[29] values instead of analyzing all of Plaintiff's medical tests and clinical observations. Plaintiff points to a sixty-second run-in-place test performed by Dr. Stopford and Dr. Dave as medical evidence showing Plaintiff's impairment.  Plaintiff cites Boiles v. Barnhart, 395 F. 3d 421, (7th Cir. 2005) and Barnett v. Barnhart, 381 F. 3d 664, (7th Cir. 2004) in support of his argument.

Boiles and Barnett are easily distinguishable from the present case.  In Boiles, the issue was whether the claimant's nighttime psuedoseizures equaled the seizures in listing 11.02. 395 F. 3d 421 (7th Cir. 2005).  Since no listing dealt directly with pseudoseizures, the claimant analogized her condition to that of listing 11.03. Id.  In Boiles, all of the requisite criteria for listing 11.03 were met and the claimant had documented episodes and manifested residuals that occurred more than once per month in frequency. Id.  The ALJ in Boiles decided only whether Boile's pseudoseizures equaled, in severity, the seizures listed in 11.03.  In the present case, unlike in Boiles, Plaintiff's pulmonary condition is directly addressed by section 3.02 and 3.03. Plaintiff's pulmonary condition is addressed by evaluations in section three, pulmonary listings, whereas, Boile's psuedoseizures were not contained within any listing.  Further, his FEV1 of 1.48L and FVC of 2.05L do not meet the requisite criteria of listings 3.02 and 3.03.  For these reasons, Boiles does not support Plaintiff's contention that the ALJ did not provide substantial evidence to support his decision.

Barnett also fails to support Plaintiff's argument that the ALJ made critical errors in his decision.  In that case, the court held that because the ALJ failed to adequately determine that the

---

[28] Forced Vital Capacity (FVC) "measures the amount of air you can exhale with force after you have inhaled as deeply as possible." Nissl, supra note 2, at 3.

elements of 11.03 were present, the case should be remanded to affirmatively determine the frequency of seizures that the claimant endured. 381 F. 3d 664, (7th Cir. 2004).  In the present case, the ALJ evaluated the FEV1 and FVC values of listings 3.02 and 3.03 and determined that the FEV1 and FVC values did not meet the requisite levels.

Substantial evidence supports a finding that Plaintiff's condition did not meet or medically equal a listed impairment in section 3.02 or 3.03. "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment." Maggard v. Apel, 167 F.3d 376, 380 (7th Cir. 1999).  Thus, to meet either of the 3.02 or 3.03 listings, a person of Plaintiff's height, 69.8 inches, must have a FEV1 of less than or equal 1.45 L or a FVC of less than or equal to 1.65 L. 20 C.F.R. §404, Subpt. P, App. 1, §3.002.  As the ALJ pointed out in his opinion, Plaintiff's FEV1 was 1.48L and his FVC was 2.05L.  In concluding that this condition does not meet or equal the 3.02 and 3.03 listings, the ALJ addressed the elements of the listings and used medical tests performed by Dr. Dave as the basis for his determination.  There is no indication that the ALJ substituted his own medical judgment for that of the physicians in finding that Plaintiff's condition did not meet or medically equal a listed impairment in 3.02 and 3.03.

Plaintiff next argues, however, that the ALJ failed to properly evaluate listing 3.10 when the ALJ stated that the record was void of the requisite evidence to support the claim for a 3.10 listing.  Plaintiff does not, however, point to any evidence in the record to support a finding under the 3.10 listing.  Instead, Plaintiff argues that his functional limitations are analogous to listing 12.04 – Affective Disorders criteria C which requires, among other things, "a medically documented history of a chronic affective disorder of at least two years." C.F.R. §404, Subpt. P,

---

[29] Forced Expiratory Volume at one second (FEV1) "measures the amount of air you can exhale in one breath." Id.

App. 1, §12.04.  In support of this argument, Plaintiff provides anecdotal evidence of his mood and activities following the pepper spray incident.

The Court finds this argument unpersuasive.  As the ALJ stated, Plaintiff "has never had any mental health treatment or hospitalizations beyond the provision of medication by his pulmonary and primary physicians." (Tr. 144).  The Court agrees that Plaintiff failed to establish in step three of the disability determination process that his impairment meets or equals an impairment listed in the regulations.

Plaintiff also argues that the ALJ analyzed Plaintiff's functional limitations improperly because he mischaracterized Plaintiff's testimony.  Plaintiff claims that the ALJ would find Plaintiff disabled if he properly applied the functional limitation test of 20 C.F.R. § 404.1520(c) to Plaintiff's combination of impairments.  Plaintiff cites Dixon v. Massanari in support of his argument for the proposition that the ALJ's decisions are not based on substantial evidence when the evidence is mischaracterized. 270 F. 3d 1171 (7th Cir. 2001).

Plaintiff alleges that the ALJ mischaracterized the evidence in the following ways:

- The ALJ stated that Plaintiff was able to bend, stoop, squat and perform manipulation with his hands.  Plaintiff points to testimony where he claims to have difficulty while bending over, pain in his knee in damp and cold weather, and shaking lasting for a half hour after breathing treatments.

- The ALJ stated that Plaintiff watches videos and plays video games despite Plaintiff testimony that he did not play video games.

- The ALJ stated that Plaintiff deer hunts, but that testimony showed only one occasion of Plaintiff deer hunting. Plaintiff notes in his brief that he was much less active in that particular deer hunt than in past deer hunts.

- The ALJ stated that Plaintiff occasionally played basketball with his son when testimony showed that Plaintiff only "shot around for a little while" with his son.

- The ALJ stated that Plaintiff "goes to Wal-Mart and shops and has no problem with strangers." Plaintiff states that this unfairly presents him as a "gregarious individual who goes to Wal-Mart to pass the time."

- The ALJ stated that Plaintiff mows the grass with a riding mower while taking the proper precautions. Plaintiff points to testimony that states, "If I mow with the riding mower I have to wear a mask and that makes it more difficult to breath (sic) besides the heat and humidity so about 15 min. is all I can handle and I have 3 acres to mow." (Tr. 318).

Dixon v. Massanari, 270 F. 3d 1171 (7th Cir. 2001), holds that "…agency's findings of fact are conclusive so long as substantial evidence supports them and there is no error of law. See also 42 U.S.C. § 405 (g). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 270 F. 3d at 1176. In the present case, the ALJ's findings of fact are supported by substantial evidence. The record shows that the Plaintiff watched videos, hunted deer with a gun, shot a basketball at a goal with his son, and visited Wal-Mart (Tr. 182-205). The ALJ also found that Plaintiff was able to manipulate hands, walk for thirty to forty-five minutes, lift fifty to seventy-five pounds, travel to the hearing, take his children to school, cook, camp, run a political campaign, and cut fiberboard with his friends. While it appears that the ALJ incorrectly stated that Plaintiff admitted to playing video games, this fact, alone, is not enough to find that the ALJ's findings of fact were not supported by substantial evidence. And While Plaintiff may have difficulty bending, he does not contest his ability to stoop, squat or manipulate his hands. The Court finds that, even negating any

inconsistencies, substantial evidence exists such that a reasonable mind would find the evidence adequate to support the ALJ's conclusion.

**(2)     Plaintiff's Treating Physicians**

Plaintiff argues that the ALJ improperly disregarded the medical opinions of pulmonologists Dr. Dave, Dr. Tuteur, and Dr. Stopford when making his residual function capacity (RFC) finding.  Specifically, Plaintiff disagrees with the ALJ's finding that Plaintiff need only avoid concentrated exposures to harmful agents.  Plaintiff argues that the medical evidence supports a finding that he should avoid any exposure to harmful agents.

Plaintiff points to Brindisi v. Barnhart to support his argument that the ALJ substituted his own medical judgment for that of his treating physicians. 315 F.3d 783 (7th Cir. 2003).  In Brindisi, the ALJ erred in several respects – the  ALJ failed to mention the impairment listings for which the claimant applied, provided no analysis for his decision, and failed to confront material conflicting evidence in his decision.  In the present case, the ALJ did not commit any of the errors present in Brindisi.  The ALJ cited and discussed the listings in his decision and openly discussed testimony by Dr. Dave that was unfavorable to his decision (Tr. 146-147).  Brindisi simply does not support Plaintiff's argument that the ALJ substituted his own medical judgment for that of the treating physicians.

The ALJ improperly discounted the testimony of Plaintiff's treating physicians, Plaintiff argues, by claiming to give the Illinois Bureau of Disability Determination Services (DDS) only moderate weight, when the ALJ in fact based his RFC assessment on the DDS assessment. Although the ALJ stated that he gave Dr. Tuteur's RFC significant weight, Plaintiff argues that, in reality, Dr. Tuteur's assessment was given less weight than the DDS RFC assessment.

The Court has reviewed the record and Plaintiff's allegations are unsupported.  The ALJ's decision called for avoidance of "…concentrated exposure to temperature extremes (hot and cold), high humidity, cigarette smoke, perfumes, odors, dusts, gases, chemicals, and areas of poor ventilation" (Tr. 149).  The RFC assessment from DDS has a section entitled Environmental Limitations, where several categories of possible environmental limitations are listed (Tr. 333).  DDS selected only one category that suggested limits on Plaintiff's environmental exposure (Tr. 333).  That category was listed as "[f]umes, odors, dusts, gases, poor ventilation, etc.," and it was indicated that Plaintiff should "avoid concentrated exposure." (Tr. 333).  There were seven other possible environmental limitation categories listed that were not selected by the DDS, including extreme heat, extreme cold, and humidity.  These three additional categories were included in the RFC assessment by the ALJ, even though they were not recommended by the DDS (Tr. 149).  These three categories were, however, suggested by Dr. Tuteur during his testimony before the ALJ (Tr. 399).  From the record it appears that the ALJ gave Dr. Tuteur's opinion significantly greater weight than he assigned to the DDS RFC assessment.

The ALJ granted only "modest weight to Dr. Dave's assessment because he found the assessment inconsistent with other testimony.  Plaintiff believes it was an error for the ALJ to so discount the credibility of a treating physician.

"[I]f…the ALJ finds that the treating physician's evidence is not credible, he is not required to give it controlling weight." Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982).  An ALJ must support a decision, that the treating physician is not credible, with substantial evidence in the record. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Dixon, 270 F. 3d at 1176.

Dr. Dave reported that Plaintiff was limited to performing less than two hours of walking or standing in an eight-hour period, with very restrictive postural and environmental limitations (Tr. 744).  Dr. Dave also reported that Plaintiff was unable to stand more than thirty minutes, and could walk no more than one or two blocks without rest or sever pain (Tr. 711).  On September 9, 2004, Dr. Dave gave Plaintiff a letter addressed to "To Whom It May Concern," in which Dr. Dave stated, "At this time, [plaintiff] is deemed disabled to complete his work in a normal fashion because of his persistent shortness of breath." (Tr. 747).  Plaintiff argues simply that the ALJ's granting of only modest weight to Dr. Dave's assessment was reversible error.

The ALJ stated that he only granted modest weight to Dr. Dave's assessment because he found that the record, as a whole, shows inconsistencies between Plaintiff's testimony and the activities that Dr. Dave said that Plaintiff could not perform.  While Dr. Dave suggested stringent environmental limitations along with less than two hours of walking / standing in an eight hour period, Plaintiff's own testimony was that he participated in shopping, drove, hunted, ran a campaign, mowed the lawn, and shot a basketball with his son. The ALJ also noted that findings of both the DDS and Dr. Tuteur, one of Plaintiff's treating physicians, conflicted with the findings of Dr. Dave.  Dr. Tuteur and the DDS found that Plaintiff was not nearly as restricted as Dr. Dave suggests, and further, their suggested limitations support a finding that Plaintiff could work in a sedentary job.  There is substantial evidence in the record that supports the ALJ's finding that Dr. Dave's assessment lacked credibility and, therefore, he was not required to give the assessment controlling weight.

Plaintiff next argues that the ALJ completely ignored the consultation and opinions of Dr. Stopford and incorporated only one statement from Dr. Stopford's report into his decision. Although an ALJ must "articulate, at some minimum level, his analysis of the evidence he is not

required to address every piece of evidence or testimony." <u>Dixon</u>, 270 F.3d 1176 (7th Cir. 2001).

Further, while an ALJ may not disregard entire lines of evidence that are contrary to his findings,

he need not provide a complete written evaluation of every piece of testimony and evidence in the

record. <u>Henderson v. Apfel</u>, 179 F.3d 507, 514 (7th Cir. 1999).

  Plaintiff's brief does not direct the Court to any aspect of Dr. Stopford's report that

contradicts the ALJ's decision.  Plaintiff's brief quotes a section of Dr. Stopford's deposition that

talks about Reactive Airways Disease, what a baseline is, how a patient's a baseline is affected by

exercise and chemicals, and an explanation of the patient's lifestyle made to the doctor by the

patient.  It has not been shown how this section is section inconsistent the ALJ's decision. The

ALJ acknowledged Plaintiff's RAD, along with other conditions, and determined that it was not

severe enough to warrant a "disabled" designation.  The ALJ appears to have based his decision

upon the record as a whole, including the FEV1 and FVC medical tests, treating doctor opinions,

and Plaintiff testimony.  The ALJ provided more than the required "glimpse into his reasoning

behind his decision to deny benefits," <u>Zurawski v. Halter</u>, 245 F.3d 881, 889 (7th Cir. 2001), and

Plaintiff's point of error must be denied.

**(3)**  **Plaintiff's Credibility**

  The ALJ found Plaintiff's allegations of disability exaggerated and not credible.  Plaintiff

asserts that this credibility determination is patently wrong because the ALJ's ignored medical

testimony supporting Plaintiff's allegations while failing to show contradictions in Plaintiff's own

testimony.

  The Court must grant the ALJ special deference in his credibility determinations because

he is in the best position to assess a witness's forthrightness. <u>Powers v. Apfel</u>, 207 F.3d 431, 435

(7th Cir. 2000).  Reversal of an ALJ's credibility determination is warranted only if the claimant

can show it was "patently wrong." Id.  The ALJ's credibility determination will be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding." Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir.  2004).

Plaintiff's argument that the ALJ "substituted his own unqualified opinion" for that of the physicians who have treated and examined Plaintiff is not well taken. (Doc. 17 at 44).  Despite Plaintiff's expostulation, his argument is without merit in that it was precisely the contradiction between Plaintiff's testimony about his actions and the limitations he and one of his treating physicians claimed that formed the basis of the ALJ's credibility determination.

The ALJ supported his credibility determination by giving specific reasons supported by the record.  The ALJ discussed Plaintiff deer hunting, shopping, camping, running a political campaign, and cutting fiberboard at a friend's house (Tr. 144-146).  These activities were engaged in by Plaintiff when the environment around him could not be controlled, despite the Plaintiff's claims that he must avoid even moderate exposure to antigens.  For example, the record indicates that Plaintiff shopped at Wal-Mart (Tr. 195), hunted deer (Tr. 195-196), and assisted his wife with operation of a mini-mart and family diner (Tr. 419), all of which took place in unregulated environments.  Inconsistencies arise when Plaintiff's testimony regarding his limitations, taken together or in isolation of the treating physicians' medical evidence, is compared with the activities Plaintiff admits participating.

The ALJ could reasonably conclude that Plaintiff's testimony regarding his inability to work was not totally credible and, therefore, he was justified in not finding Plaintiff's testimony as being totally credible. Herr v. Sullivan, 912 F. 2d 178, 181 (7th Cir. 1990).  This Court finds that the ALJ's credibility determination as to Plaintiff is based on substantial evidence and, therefore, is not "patently wrong."

(4)     **Plaintiff's Past Relevant Work**

Plaintiff argues that the ALJ's finding that Plaintiff could return to his past relevant work is not based on substantial evidence.  Specifically, Plaintiff claims the ALJ discounted the testimony given by Dr. Dave and Plaintiff, and further ignored the vocational expert (VE)'s response to Plaintiff counsel's hypothetical indicating that there would not likely be 2,800 jobs available to a person who must (1) "avoid even moderate exposure to…extreme cold, extreme heat, high humidity, and wetness and dust," and (2) "[a]void all exposure to cigarette smoke, perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases and chemicals." (Tr. 217-218).

As discussed above, the ALJ was not patently wrong in his credibility determination regarding Dr. Dave and Plaintiff's testimony.

With regard to the VE's testimony, the Court does not find that the ALJ improperly discounted the VE's response to Plaintiff counsel's hypothetical.  In response to the ALJ's hypothetical, the VE testified to the ALJ that thousands of jobs existed in the national economy consistent with Plaintiff's past relevant work, even with certain limitations, including the need to avoid concentrated exposure to lung or breathing irritants.  Plaintiff's hypothetical only centered on one of the past relevant jobs, and changed the "concentrated" limitation to must "avoid even moderate exposure" to certain environmental conditions and "avoid all exposure" to other factors such as "odors" and "perfumes" (Tr. 217).  The VE explained that if Dr. Dave's restrictions were accurate, only jobs in sterile environments such as surgical suites and laboratories would be suitable for Plaintiff (Tr. 218).

Plaintiff's argument here is simply a repackaging of his argument that the ALJ's credibility determination regarding Dr. Dave was patently wrong.  Because the Court finds otherwise, the ALJ permissibly granted little weight to Dr. Dave's opinion, and he did not have to

give controlling weight to the VE's answer to Plaintiff's hypothetical.  The VE determined that when considering limitations to concentrated levels of irritants, Plaintiff could return to past relevant work (Tr. 209-211).  Plaintiff's hypothetical asked the VE not about concentrated levels of exposure, but changed the standard to include practically any exposure whatsoever.  The ALJ determined that the proper level of exposure to be avoided was a concentrated exposure, which was consistent with the other physician's findings, save Dr. Dave.  Given the ALJ's credibility determination of Dr. Dave's assessment, he was permitted to rely on the VE's response to the hypothetical based upon concentrated levels of exposure.

**(5)      Existence of Jobs in the National Economy**

Plaintiff argues that the ALJ's determination that there is work in the national economy available to Plaintiff is not supported by substantial evidence.  Plaintiff raises two points in this regard.

First, Plaintiff argues that the ALJ posed a hypothetical to the vocational expert (VE) that was improper because it did not include all of Plaintiff's limitations.  Specifically, Plaintiff argues that the ALJ's hypothetical to the VE should have included Plaintiffs limitations of blurred vision and floaters, his persistent pain, his shaking as a side effect of nebulizer treatments, his need to be absent from work a certain number of days, his impaired memory, his hoarse and raspy voice, his stringent environmental restrictions as suggested by Dr. Dave, and Plaintiff's testimony about the duration of his nebulizer treatments.

"Hypothetical questions posed to the vocation expert must include all limitations supported by medical evidence" <u>Steele v. Barnhart</u>, 290 F. 3d 936, 942 (7th Cir. 2002).  The reason for this rule is to ensure that the VE has knowledge of the claimant's full range of limitations. <u>Id.</u> at 942.  Therefore, an exception "exists for cases in which the vocational expert

learned of the limitations (through other questioning at the hearing or outside review of the medical records) and presumably accounted for them." Id.

In this case, the ALJ verified that the VE reviewed Plaintiff's medical history and observed his earlier testimony (Tr. 205-206).  The ALJ also posed a hypothetical that included the conditions that he found to be relevant to Plaintiff's condition (Tr. 208-209).  The VE testified that, based on the hypothetical presented before him, Plaintiff had ample opportunities to work in the regional economy (Tr. 214-215).  The ALJ also questioned the VE about the RFC assessment from Dr. Dave (Tr. 212).  The VE then discussed the issues reported in Dr. Dave's assessment that would preclude Plaintiff from work (Tr. 212-214).

The Court finds that the VE reviewed the record and was aware of the claimant's limitations.  The VE offered two opinions regarding Plaintiff's ability to work, one favorable to Plaintiff based on Dr. Dave's assessment and one unfavorable to Plaintiff based on a less stringent scenario.  The ALJ reviewed the record as a whole and permissibly accorded differing weight to the medical opinions.  Based on his review of the record, the ALJ accepted the less stringent hypothetical on which to base his decision.  Although Plaintiff may disagree with the hypothetical that the ALJ adopted, Plaintiff has failed to show that the ALJ failed to support his decision with substantial evidence.

Second, Plaintiff argues that the ALJ lacked substantial evidence to support his reliance on the opinion of the VE regarding the number of jobs which met the environmental restrictions based on Plaintiff's RFC.

"[B]ecause an ALJ's determination must be supported by substantial evidence, an ALJ may depend on expert testimony only if it is reliable." McKinnie v. Barnhart, 368 F. 3d 907, 910 (7th Cir. 2003).  "Evidence is not substantial if vital testimony is conjured out of whole cloth."

Donahue v. Barnhart, 279 F. 3d 441, 446 (7th Cir. 2002). "An expert is free to give a bottom line, provided the underlying data and reasoning are available on demand." *Id*.

   In this case, the VE explained that his testimony was consistent with the Dictionary of Occupational Job Titles (Tr. 217). The VE also testified that, under stringent and moderate exposure to various environmental restrictions, no job was available to Plaintiff, but that many jobs would be available to Plaintiff if he need only avoid concentrated environmental conditions (Tr. 217-218). Upon examination by Plaintiff's attorney, the VE testified that he was unaware of any source that categorized environmental restrictions present in security guard or dispatch jobs (Tr. 219). When asked how he reached his answer to the ALJ's first hypothetical, the VE said:

> My work with people who have lung problems, conversations and observations,
> in summaries prepared by treating pulmonologists and my understanding
> generally of how atmospheric conditions vary as a function of work environment
> along with continuum in trying to match these people with these problems to
> these environments.

(Tr. 219). Later, the ALJ clarified the VE's opinion of work available under the hypothetical questions, but Plaintiff made no further inquiries to the VE's reasoning and made no requests to have the VE supplement the record. "Plaintiff must do more than merely 'question' the vocational expert's numbers." Begolke v. Astrue, 2007 U.S. Dist. LEXIS 41747 (D. Wis. 2007). Plaintiff must provide evidence to support a theory that the VE's numbers were pulled out of "whole cloth." Id. In this case, the VE explained his reasoning and Plaintiff made no further pursuits into the VE's reasoning. Plaintiff has not demonstrated that the ALJ lacked substantial evidence to support his reliance on the VE's testimony regarding jobs that Plaintiff could perform given the ALJ's assessment of Plaintiff's RFC.

CONCLUSION

For the above reasons, it is **RECOMMENDED** that the Plaintiff's petition be **DENIED**, that **JUDGMENT** be entered in favor of the Defendant, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1 (b), the parties shall have ten (10) days after service of this recommendation to file written objections thereto.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or Court of Appeals. Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004); United States v. Hernandez-Rivas, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: August 9, 2007**

s/ *Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**